# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JERRY JAMES STANTON,

    Plaintiff,

        v.

NANCY HUTCHINS,
Branch County Register of Deeds,
BAMBI SOMERLOTT,
Hillsdale County Register of Deeds,

LAURIE ADAMS, Coldwater Township Assessor,
JEFFREY BUDD, Coldwater Township Treasurer,

SANDRA S. THATCHER, Branch County Treasurer,
ROBERT J. KLEINE, State of Michigan Treasurer,

MIKE COX, Michigan Attorney General,
KEVIN T. SMITH, Michigan Assistant Attorney General,

MICHAEL A. STIMPSON, Michigan Tax Tribunal Judge,

PATRICK W. O'GRADY, Circuit Court Judge,
Branch County, Michigan,

MARK STODDARD, Michigan Appeals Court Counsel,
BRIAN DEITRICH, Clerk, Michigan Appeals Court,

DONALD S. OWENS, WILLIAM C. WHITBECK,
STEPHEN L. BORRELLO, DAVID H. SAWYER,
JOEL P. HOEKSTRA, DOUGLAS B. SHAPIRO,
Michigan Court of Appeals Judges,

CLIFFORD B. TAYLOR, MICHAEL F. CAVANAUGH,
ELIZABETH A. WEAVER, MARILYN KELLY,
MAURA D. CORRIGAN, ROBERT P. YOUNG JR.,
and STEPHEN J. MARKMAN,
Justices of the Michigan Supreme Court,

Case No. 1:10-cv-74

HONORABLE PAUL L. MALONEY

Magistrate Judge Joseph G. Scoville

Defendants. |

|

|

_____

**OPINION and ORDER**

**Denying the Plaintiff's Application for Preliminary Injunctive Relief**

This court has federal-question jurisdiction because the plaintiff, Mr. Jerry James Stanton

("Stanton"), purports to assert claims under the United States Constitution, a federal civil-rights

statute (42 U.S.C. § 1983), several provisions of Title 18 of the U.S. Code (§§ 1341 and 1346), and

at least two  provisions of the Racketeering-Influenced and Corrupt Organizations Act a/k/a RICO

(18 U.S.C. §§ 1962 and 1964).  *See* Complaint filed March 4, 2010 ("Comp") at 1-3.  Proceeding

*pro se*, Stanton asserts 38 claims against 25 defendants, all of whom are employed by the State of

Michigan's executive or judicial branches or one of its county or local government subdivisions'

judicial or executive branches:

> 2 Register of Deeds for Branch County and Hillsdale County (Hutchins and Somerlott)
> 2 Coldwater Township Assessors (Adams and Budd)
> State Treasurer Kleine and Branch County Treasurer Thatcher
> State AG Cox and Assistant State AG Smith
> State Tax Tribunal Judge Stimpson
> Branch County Circuit Court Judge Patrick O'Grady
> 2 Court of Appeals employees (Counsel Mark Stoddard and Clerk Deitrich)
> 6 Court of Appeals Judges (Owens, Whitbeck, Borrello, Sawyer, Hoekstra, Shapiro)
> 7 Supreme Court Justices (Taylor, Cavanagh, Weaver, Kelly, Corrigan, Young, Markman)

*See* Comp ¶ 8.  Stanton owns two parcels of real property in the City of Coldwater, Branch County,

Michigan, and brings this action to remedy alleged violations of his constitutional and natural rights

with regard to those properties, *see* Comp ¶¶ 244-245, including the right to freely acquire and keep

private property without interference or harassment or overriding government claims thereto

-2-

(consistent with the understanding which prevailed in the colonies and Great Britain before the founding of the United States of America), the right to be left alone, the right to the pursuit of happiness and prosperity, and the right to a republican form of government with checks and balances and strictly limited powers where natural individual rights are not violated even with the approval of a majority of voters or elected officials or judges, *see* Comp ¶¶ 3-7 (citing Ex A ("Branch County Instrument #2006-07381, Page 34 ¶ 46")) and Comp ¶ 13. Although the caption does not state that Stanton is suing the defendants in their personal capacity, the body of the complaint does state that he is seeking monetary damages against them in that capacity. *See* Comp at 4, Section III-h.

Among many other types of relief sought in the complaint, Stanton's application for preliminary injunctive relief asks this court to prevent the State of Michigan from requiring him to pay the property taxes which a state tribunal has apparently held that he owes, as a condition precedent to bringing an appeal, by a March 14, 2010 deadline, in the Michigan state system. He contends that this court should effectively reverse or disregard a judgment of the Branch County, Michigan circuit court holding that the law requires such payment in that sequence, on the ground that that court lacked jurisdiction and hence that the resultant judgment is void. *See* P's PI App at 1-2. The PI application weaves in and relies on themes and legal premises from Stanton's complaint, including the notion that the Michigan tax and judicial system, in so requiring, and in refusing to consider his constitutional objections, violates the Northwest Ordinance of 1787 in some unspecified way, violates his natural and constitutional rights.

Stanton explains that he cannot or will not simply pursue a direct appeal to the Michigan Court of Appeals because

Plaintiff has already established for the record of this Court [presumably in his

complaint, summarized and discussed at length below] that the Michigan Appeals Court will completely subvert and circumvent, any appeal of the Plaintiff thereby denying due process and creating yet another basis of charge against the Court of Appeals Judges and Clerks just as the Branch County Circuit court and above named defendants have done yet again.

P's PI App at 2. As will be seen below, however, Stanton has not yet demonstrated or adequately explained – if he ever will be able to do so – that the Michigan Court of Appeals allegedly "subverted" or improperly thwarted or rejected his appeal from any judgment or order. Apparently Stanton argued before the Circuit Court of Branch County that that court lacked jurisdiction, relying on *Hibbs v. Winn*, 542 U.S. 88 (2004), which he characterizes – without any quotation or citation to the majority opinion – as holding that "the State Courts lose absolute jurisdiction and protection of the Tax Injunction Act when their proceedings fail to allow and address constitutional arguments before them." P's PI App at 1-2. In any event, Stanton asks this court to preliminarily enjoin any action to enforce the Branch County Circuit Court judgment by way of foreclosure and/or eviction. *Id.* at 3. **For the reasons that follow, the court will deny Stanton's application for preliminary injunctive relief without the need to consider the potential applicability of the Tax Injunction Act.**

To understand the background and context of Stanton's PI application, a review of his complaint and the premises underlying his challenge to the Michigan property tax assessment, collection and appeal system is helpful. **In count one, lodged against Branch County Register of Deeds Nancy Hutchins and Hillsdale County Register of Deeds Bambi Somerlott** (collectively "the Registers"), he assails as fraud the assignment of parcel identification numbers to his real property and charges that mailing documents to him using such numbers constitutes fraud in violation of "the racketeering statutes", *see* Comp ¶¶ 15-16, and violates his inalienable rights to

private property, happiness and prosperity by effectively making the State of Michigan and its government subdivisions the owner of all real property within its borders, *id.* ¶¶ 17-20. Stanton asserts that the very existence of the State's property-taxation system is an affront to those rights; he cites five Supreme Court decisions for this proposition, *id.* ¶ 21, but he fails to quote any specific language from any of them, fails to even cite a putatively relevant page for some of them, and fails to proffer any holding or reasoning from those decisions which might support such sweeping propositions. He further asserts, still in count one, that these registers committed "perjury" against their oaths of office and committed "fraudulent theft of honest services" in violation of 18 U.S.C. § 1346, "not just by making claims of taxability of property to enrich the State (which they may or may not take part in), but also by depriving the 'Plaintiff' and the People of Michigan of [the] right to honest services expected by their oaths and checks and balances function of a Republic." Comp ¶ 23.

Stanton claims that the registers' conduct in assigning tax identification numbers and using those numbers in official documents and correspondence also somehow constitutes a "scheme or artifice to defraud" and/or "obtaining money or property by means of false or fraudulent pretenses, representations." But Stanton's PI application provides no decisions, even non-binding decisions from district courts or courts outside our Circuit, suggesting that 18 U.S.C. §§ 1341, 1346,[1] or 1351

---

[1]

Title 18 U.S.C. § 1341, entitled Fraud and Swindles, provides as follows:

Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so,

> places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the United States Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter of thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.
>
> If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those term are defined by . . . 42 U.S.C. 5122 . . .), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

(Paragraph breaks added.) Using WestLaw, the court finds only two decisions of any federal court which even mention 18 U.S.C. § 1341 and any of these terms: property tax, property taxation, real estate tax, real estate taxation, land tax, and land taxation. Neither is of any avail to Stanton. One deals with mail-fraud and RICO claims against a mortgage company, *see Aitken v. Fleet Mortg. Corp.*, 1992 WL 33926 (N.D. Ill. Feb. 12, 1991) (allegedly inaccurate statement of amounts necessary for escrow deposit to cover property taxes etc.). The other decision expressly rejects an argument similar to Stanton's, explaining that

> in *McNally v. United States*, 107 S.Ct. 2875 (1987) . . . the Court held that schemes to defraud the citizenry of their intangible right to the honest and faithful services of public officials are not within the scope of the mail fraud statute, 18 U.S.C. § 1341. * * *
>
> * * *
>
> *McNally* and the subsequent case of *Carpenter v. United States*, 108 S.Ct. 316 (1987), establish that the mail fraud statute proscribes schemes to deprive someone of *property* (tangible or intangible), but does not cover schemes to defraud the citizenry of the right to good government.

*US v. McManigal*, 1988 WL 116857, *2 (N.D. Ill. Oct. 25, 1988).

Title 18 U.S.C. § 1346, entitled Definition of Scheme or Artifice to Defraud, clarifies that "For the purposes of this chapter [Title 18 U.S. Code, Part I - Crimes, Chapter 63 - Mail Fraud and Other Fraud Offenses], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Using WestLaw, the court finds not a single decision of any federal court which even mentions 18 U.S.C. § 1346 and any of these terms: property tax, property taxation, real estate tax, real estate taxation, land tax, and land taxation.

have ever been applied to, or might properly be applied to, county registers assigning identification

numbers to real property and mailing documents which contain such numbers through the U.S. mail.

The same is true of 18 U.S.C. §§ 1362 and 1364.[2]  Nothing in the language of those statutory

---

Title 18 U.S.C. § 1351, Interference with Commerce by Threats or Violence, states thus:

(a)      Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

Subsection 1351(b) defines the terms robbery, extortion, and commerce.  Subsection 1351(c) merely cautions that this section is not intended to modify, repeal, or affect 15 U.S.C. 17 ("Antitrust laws not applicable to labor organizations"); 29 U.S.C. §§ 52 (restricting federal courts' authority to issue injunctive relief in certain employment-related disputes), 29 U.S.C. §§ 101-115 (same); 29 U.S.C. §§ 151-166 (national labor relations policy and findings, NLRB, employee rights of collective bargaining and organization, unfair labor practices, etc.); or 45 U.S.C. §§ 151-188 (railway labor provisions).  Using WestLaw, the court finds not a single decision of any federal court which even mentions any subsection of 18 U.S.C. § 1351 and any of these terms:  property tax, property taxation, real estate tax, real estate taxation, land tax, and land taxation.

[2]Title 18 U.S.C. § 1362, entitled Malicious Mischief - Communication lines, stations or systems, provides, in pertinent part:

Whoever willfully or maliciously injures or destroys any of the works, property, or material of any radio, telegraph, telephone or cable, line, station, or system, or other means of communication, operated or controlled by the United States, or used or intended to be used for military or civil defense functions of the United States, whether constructed or in process of construction, or willfully interferes in any way with the with the working, or use of any such line, or system, or willfully or maliciously obstructs, hinders, or delays the transmission of any communication over any such line, or system, or attempts or conspires to do such an act, shall be fined under this title or imprisoned not more than ten years, or both.

Title 18 U.S.C. § 1364, entitled Interference with foreign Commerce by Violence, provides that

Whoever, with intent to prevent, interfere with, or obstruct or attempt to prevent, interfere with, or obstruct the exportation to foreign countries of articles from the

provisions remotely suggests that they might prohibit such routine organizational and ministerial conduct in the administration of a state or local property tax system which is authorized by state constitution or statute and which has not been invalidated or seriously questioned by any court on the ground of federal constitutional infirmity, let alone some infirmity based on the Northwest Ordinance of 1787 or natural-rights theory or the like.

**Themes running throughout Stanton's complaint include the notions that he is a "sovereign elector/progenitor, with sovereignty over and above that of the government",** Comp ¶¶ 240-241, and has inalienable rights that predate the formation of governments, including the rights to happiness, prosperity, and private property, *id.* ¶¶ 242-244.  After noting that Michigan joined the Republic as a State in 1837, Comp ¶ 246, Stanton emphasizes the propositions that all the defendants hold Michigan government offices which were created or authorized by "the Constitution" (presumably the Michigan Constitution) or "the Legislature" (presumably the Michigan Legislature), and are bound by their oaths to respect the Constitution, *id.* ¶¶ 247-248; that the United States of America and Michigan are required to have a republican form of government with limited powers, *id.* ¶¶ 249-250 and 254 and 298; that governments are not permitted to violate an individual's inalienable rights notwithstanding a majority vote of doing so, *id.* ¶¶ 251 and 264 and 310, not even in time of war, *id.* ¶ 300; and that the Michigan state government is obligated to obey the U.S. Constitution and cannot be legitimate unless it does so, *id.* ¶¶ 256 and 260.

---

United States, injures or destroys, by fire or explosives, such articles or the places where they may be while in such foreign commerce, shall be fined under this title or imprisoned not more than twenty years, or both.

Using WestLaw, the court finds not a single decision of any federal court which even mentions 18 U.S.C. §§ 1362 or 1364 and any of these terms:  property tax, property taxation, real estate tax, real estate taxation, land tax, and land taxation.

**The crux of Stanton's complaint appears to be that the defendants have acted against him and his property in reliance on state constitutional and statutory provisions which violate his federal constitutional rights.** *See* Comp ¶¶ 252-253. Stanton contends generally that the State is obligated to respect his private-property rights as enshrined in the U.S. Constitution's Fifth and Ninth Amendments, the Northwest Ordinance of 1787, and the Michigan Constitution of 1963, Article III Section 7, which provides that "[t]he common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." Comp ¶¶ 256-258. He also invokes the Michigan Constitution of 1835, Article I, Sections 8 and 19, which apparently guaranteed the right to be free of unreasonable search and seizure and the right not to have one's private property taken for public use without just compensation, respectively, and Section 21, which apparently provided that any legislative acts contrary to the state constitution were void, *id.* ¶¶ 259 and 261. Stanton also invokes the 1963 Michigan Constitution, Article 23, which parallels the Ninth Amendment to the U.S. Constitution in providing that "[t]he enumeration in this constitution of certain rights shall not be construed to deny or disparage others retained by the people", *id.* ¶ 262. He notes that the courts are obligated to protect and enforce his rights in perpetuity, and in particular that he has a right of access to the federal courts to secure a remedy for all violations of his property rights and other natural and constitutional rights, regardless of any statutes purporting to define, grant or limit federal-court jurisdiction such as RICO, *id.* ¶¶ 266-267 and 289-297 and 299.

Stanton enumerates and describes various aspects of his natural and constitutional rights to private property, including the right to acquire it without harassment or interference or overriding claims by government, protect it from being taken by the public without due process and just

compensation, and enforce and vindicate these rights in court. *See* Comp ¶¶ 269-273. He asserts that one his unenumerated rights under the Ninth Amendment to the U.S. Constitution are the rights to prosperity and happiness (by which he apparently means the *right to pursue* prosperity and happiness, as he is not seeking to coerce the taxpayers into providing him with prosperity or happiness in any way), as well as the right to be left alone, *id.* ¶¶ 274-284, and that these rights include or necessarily imply the right to be free of a multitude of taxes and tax collectors, *id.* ¶¶ 276, 280, 284.

Stanton emphasizes that his right to a republican form of government mandates a system of "checks and balances" wherein each branch of government protects not its power but the rights of the people against the other branches, *see* Comp ¶¶ 301-303, which requires the Executive Branch to refuse to implement legislation which violates natural or constitutional rights, and the Judicial Branch to strike down such legislation, *id.* ¶¶ 304-306.

**Specifically, Stanton challenges the validity of provisions which he anticipates the defendants will rely upon as authority for their assessing and collecting taxes on real property within the State of Michigan,** "M.C.L. 211.1, Sec. 1 and . . . Article 9, Section 3 of the Michigan Constitution Sec. 3" because they prevent citizens from acquiring, maintaining and enjoying private property, Comp ¶¶ 312-314, and because they impair individuals' rights to prosperity, happiness, and being left alone, *id.* ¶¶ 315-317.

**Stanton challenges** MICH. COMP. LAWS § 211.78m(11)(a) and (b) as facially unconstitutional because he believes that it "effectively seizes the entire value" of an individual's private property and confiscates it by selling it sometimes for a minimum bid which is less than the property's value. *See* Comp ¶ 318. **He also challenges** Michigan's "General Property Tax Act [of]

1893 and [the] Michigan Tax Lien Sale and Collateralization Act," MICH. COMP. LAWS § 211.921 to 211.941" by converting private property and taking it for public use without just compensation, violating the constitutional prohibition on the States issuing notes, and forcing all individuals to be in contract with the State, *id.* ¶¶ 319-321 and 347. Stanton remarks that the issuance of "notes and securities" has "replaced the productive capacity and industry of the People as the source of wealth", *id.* ¶ 322, and that the United States of America has become an unsustainable, unaffordable "failed state", *id.* ¶ 323.

**Stanton contends that the Michigan jurists named as defendants have violated his right to due process and violated their oaths of office by refusing to seriously address and respond to his constitutional and inalienable-right challenges to the state's tax laws**, *see* Comp ¶¶ 324-326, and that they thereby committed fraud within the meaning of 18 U.S.C. §§ 1341 and 1346, *id.* ¶ 327.

**Stanton specifically complains that he was denied entry into the floor of a State office building where he was apparently scheduled for a hearing on January 4, 2010**, on the ground that he refused or failed to provide his telephone number, and perhaps on the ground that there were no hearings scheduled on that floor on that day. *See* Comp ¶¶ 328-330. Stanton seems to allege that security guards became alarmed at "two men seeking access to the Building", and while it is unclear, it appears that he was one of those two men and that one of the guards said that he had only seen one person go to that floor for business during his time in that job, which leads Stanton to conclude that people living in Michigan are too afraid and intimidated to challenge their tax assessments, *id.* ¶¶ 331-333.

**Stanton alleges that the tax-assessed value of certain real property increased from**

**about $10,000 in 2004 to about $31,000 in 2005**, and he claims that such a rapid, dramatic increase is unjustified in a recession and/or housing collapse, effects confiscation, and violates the right to a republican form of government, *see* Comp ¶¶ 334-335 (citing Ex N).  He also claims that some taxing authority dramatically increased the tax-assessed value of a specific woman's real property in order to retaliate against her for "exercising her rights to Happiness and Prosperity . . . to make a meeting place for her family", *id.* ¶ 336 (citing Exs O1 - O3) by which he may mean that she erected a new structure or expanded/improved an existing structure on the real property in question. Stanton makes similar arguments with regard to increases in property-tax assessments levied on two other individuals in his municipality, *id.* ¶¶ 337-342.  Stanton opines that current property-tax burdens in Michigan are tantamount to slavery, *id.* ¶ 343; speculates that the current "foreclosure and property crisis" has made the counties desperate for more tax revenue even if it means seizing the homes of large numbers of people, *id.* ¶ 344; and notes that Michigan's population has fallen below 10 million as people flee in search of a more republican form of government which shows greater respect for their rights to pursue happiness and prosperity, *id.* ¶ 345.

**Stanton complains that he sent notices to the judicial-branch and executive-branch defendants advising them of his inalienable rights and by failing to respond,** they violated their oath of office and duty to uphold a republican form of government, violated his civil rights in some unspecified way which he believes is redressable under 42 U.S.C. § 1983 and 18 U.S.C. § 1964(c) (RICO), and committed "tangible or intangible" fraud actionable or punishable under 18 U.S.C. § 1962.  *See* Comp ¶¶ 348-350 and 357 and 360.  Stanton also claims that defendants have committed mail fraud in violation of 18 U.S.C. § 1341 and "honest service fraud" in violation of 18 U.S.C. § 1346, engaged in a scheme to extort money in violation of 18 U.S.C. § 1951, and, again, violated

RICO's 18 U.S.C. § 1962, *see id.* ¶¶ 358-359.

Stanton anticipates that the defendants will invoke the defenses of Eleventh Amendment immunity, absolute or qualified official immunity for executive-branch officials, or absolute immunity for judges, and he maintains that such defenses are unavailing, *see* Comp ¶¶ 361-365. He also asserts in conclusory fashion that he is entitled to seek monetary damages against the defendant government officials and employees in their personal rather than merely official capacities, *id.* ¶¶ 366-367. Stanton next invokes a federal court's authority to enjoin a state official or employee from enforcing an unconstitutional state-law enactment, *id.* ¶¶ 368-369. Stanton concludes the complaint by stating that this court has both the authority and the obligation to exercise jurisdiction over his case, *see* Comp ¶¶ 370-372.

Significantly, Stanton acknowledges the existence of ancient U.S. Supreme Court precedent which, according to his own characterization, holds that the States legitimately have the power to tax property, but he apparently urges this court to rule contrary to those precedents. *See* Comp at 10.

On an unrelated note, Stanton repeatedly cites various sources which have no precedential force in a federal court in the Sixth Circuit, and sometimes no current precedential force or concrete, enforceable legal effect in *any* jurisdiction, such as the Magna Carta, the Northwest Ordinance of 1787, and current and former constitutions of various States (especially Virginia and North Carolina). *See, e.g.,* Comp at 12 ¶ 3.

### LEGAL STANDARD: PRELIMINARY INJUNCTIVE RELIEF

"The level of proof required for the Plaintiff to obtain a preliminary injunction or TRO 'is much more stringent than the proof required to survive a summary judgment motion.'" *Luckett v.*

*U.S. Bank Nat'l Ass'n*, 2009 WL 22858, *2 (E.D. Mich. Jan. 5, 2009) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6ᵗʰ Cir. 2000)).

To obtain preliminary injunctive relief, the plaintiff must show that he is being threatened with a legally cognizable irreparable injury for which there is no adequate legal remedy (such as monetary damages). *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6ᵗʰ Cir. 2006) (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (Thomas, J.)). When deciding whether to issue a PI, this court considers (1) whether the plaintiff has shown a substantial likelihood that it will prevail on the merits, (2) whether there is a threat of irreparable harm to the plaintiff if the injunction does not issue, (3) whether issuance of the injunction would substantially harm others, and (4) whether issuance of the injunction would serve the public interest. *Essroc Cement Corp. v. CPRIN, Inc.*, – F. Supp.2d –, –, 2008 WL 5505852, *8 (W.D. Mich. 2008) (Maloney, C.J.) (citing *Hilliard v. Clark*, 2007 WL 2589956, *3 (W.D. Mich. Aug. 31, 2007) (Maloney, J.) (citing *Warshak v. US*, 490 F.3d 455, 465 (6ᵗʰ Cir. 2007))).[3]

---

[3]

At least two circuits hold that likely success on the merits is a *sine qua non* of injunctive relief. *See AFGE, AFL-CIO v. US*, 104 F. Supp.2d 58, 64 (D.D.C. 2000); *Wine & Spirits Retailers, Inc. v. RI*, 418 F.3d 36, 46 (1st Cir. 2005) ("The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become a matter of idle curiosity."). The rationale is that "'[w]ithout such a substantial indication [of likely success on the merits], 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *AFGE*, 104 F. Supp.2d at 64 (quoting *Am. Bankers Ass'n v. NCUA*, 38 F. Supp.2d 114, 141 (D.D.C. 1999) (quoting *WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977))).

*Accord Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 849 n.52 (N.D. Ill. 1987) ("[T]he merits inquiry may be viewed as the most critical. [A] failure on that score is immediately fatal to plaintiff.") (citing *O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 580 (7ᵗʰ Cir. 1981)); *San Miguel v. DPW*, 2008 WL 541150, *5 (S. Ct. Guam Terr. Feb. 20, 2008).

Our Circuit has not yet expressly called the likelihood of success on the merits the *sine qua non* of preliminary injunctive relief. It has held, however, that it was not error to dispense with

The failure to show any likelihood of success on the merits – let alone a strong or substantial likelihood of success – is enough, by itself, to warrant denial of preliminary injunctive relief. *See Abbey v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006) ("a finding of no likelihood of success 'is usually fatal'") (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir 2000)); *see also Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp.2d 962, 967 n.1 (W.D. Mich. 2008) (Maloney, C.J.) ("Our Circuit has not yet expressly called the likelihood of success on the merits [a] *sine qua non* of preliminary injunctive relief. It has held, however, that it [i]s not error to dispense with analysis of the other three factors where the movants ma[k]e a weak showing on the merits.") (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) and *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003)).

---

analysis of the other three factors where the movants made a weak showing on the merits:

> Because the district court found . . . that the plaintiffs did not have a substantial likelihood of success on the merits . . . [it] did not make findings on the record with respect to the remaining three factors to be considered when determining whether a [PI] should issue. Since the district court apparently considered that the failure of the plaintiffs to show a likelihood of success on the merits was significant enough to prevent the injunction from issuing, the additional findings were not necessary. *See generally American Imaging Servs., Inc. v. Eagle-Picher Indus., Inc.* . . ., 963 F.2d 855, 862 (6th Cir. 1992) (stating that the district court is not required to make findings on factors that are not dispositive with respect to the issuance of a [PI]); 11A [Wright, Miller, and Kane], FEDERAL PRACTICE & PROCEDURE § 2948.3, at 184-188 (2d ed. 1995) (noting that the plaintiff must generally show at least some probability of success on the merits in order to obtain a [PI]).

*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (¶ break added). *See also Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) ("[A] district court is not required to make specific findings concerning each of the four factors used [in federal courts] in determining a motion for [PI] if fewer factors are dispositive of the issue."). For a recent summary of all the circuits' standards for preliminary injunctive relief, *see Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1363-67 (Fed. Cir. 2008) ("All of the circuits have placed the [PI] in terms of the likelihood of success on the merits and equitable factors. No circuit has held that it suffices simply to raise a 'substantial question.'").

**DISCUSSION**

For the reasons that follow, the court concludes that Stanton is exceedingly unlikely to prevail on the merits of his claims. That alone requires denial of his application for preliminary injunctive relief, without consideration of the other three factors. "'[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors became matters of idle curiosity.'" *Cambria v. Rockingham Cty. Dep't of Corrs.*, – F. Supp.2d –, 2010 WL 55319, *2 (D.N.H. Jan. 5, 2010) (quoting *New Comm Wireless Servs. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)); *accord Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 2009 WL 4912089, *2, – F. Supp.2d – (E.D. Wis. Dec. 11, 2009) (also quoting *New Comm*); *Skinner v. Unknown Grandson*, 2006 WL 1997392, *12 (E.D. Mich. July 14, 2006) ("Notwithstanding this balancing approach, however, the likelihood of success and irreparable harm factors dominate the preliminary injunction inquiry."). Even if the court did consider the other three factors, they would not alter the outcome; for example, neither Stanton nor the public interest would be harmed in any legally cognizable way by the court's refusal to preliminarily enjoin the complained-of actions and practices of the defendants when there is no precedent suggesting that such actions and practices give rise to any judicially enforceable federal cause of action on his part.

In counts two through four, also lodged against the two county registers, Stanton contends, *inter alia*, that the refusal to remove such land parcel tax-identification numbers and stop such correspondence and the related assessments violate the executive-branch defendants' oaths of office, violate his natural and unenumerated constitutional rights to pursue property and happiness and be left alone and to have a republican form of government with checks and balances, and violate

RICO. *See* Comp ¶¶ 26-38. These claims lack merit due to the same lack of reasoned argumentation supported by any precedent whatsoever. Stanton also asserts the novel and fantastical proposition that because he mailed notices to the registers advising that their failure to respond within twenty days would constitute their "stipulation" to his theories about their violation of his rights, such violations have been conceded. Stanton cites no authority for this notion, and the court finds none.

**In counts five through seven, Stanton claims, *inter alia*, that four defendants – the Coldwater Township treasurer and tax assessor, and the State and Branch County treasurers – committed** mail fraud, fraudulent theft of honest services, and racketeering offenses in violation of 18 U.S.C. §§ 1341, 1346, 1951, and 1962, violated their oaths of office, and violated various nebulous rights such as the right to a republican form of government and checks and balances – by attaching or approving the attachment of tax-identification numbers to his real-property holdings, by imposing or approving the imposition of invalid claims for taxes thereon, or by benefitting from any of the aforementioned conduct. *See* Comp ¶¶ 39-51. Largely for the reasons stated in the discussion of counts one through against the county registers, these counts five through seven likewise appear very unlikely to meet with success on fuller briefing and consideration.

**Counts 8 through 10**, *see* Comp ¶¶ 53-68, **are unlikely to meet with success on their merits, because they seek to hold a Michigan Tax Tribunal judge liable for the content of decisions and rulings made in his judicial capacity and on issues fairly presented to him**. Such a claim is likely to be defeated by the well-settled doctrine of absolute judicial immunity. *See Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) ("Functions that serve as an 'integral part of the judicial process' or that are 'intimately associated with the judicial process' are absolutely

immune from civil suits.") (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).

**Counts 11 through 13**, *see* Comp ¶¶ 69-85, are likely to be dismissed on the ground of absolute judicial immunity as well, because they seek relief against Michigan Court of Appeals judges based on the content of their judicial decisions and rulings on issues which they were obligated to address in their role as appeals judges. *See, e.g., Nicklay v. Osterhaven*, 2008 WL 2945932, *1 (W.D. Mich. July 24, 2008) (Jonker, J.) ("Even if Defendant acted maliciously or corruptly, and even if he did so while acting in excess of his jurisdiction, he is entitled to judicial immunity from suit for damages unless the complained-of actions were not taken in a judicial capacity, or unless the actions were taken in complete absence of all jurisdiction.") (citing *Mireles v. Waco*, 590 U.S. 2, 11 (1991) and *Stern v. Mascio*, 262 F.3d 600, 607 (6th Cir. 2001) ("This immunity applies to actions brought under 42 U.S.C. § 1983 to recover for alleged deprivation of civil rights.") (citing *Pierson v. Ray*, 386 U.S. 547, 554-55 (1967))).

**Counts 14 through 16,** *see* Comp ¶¶ 86-103, are likely to be dismissed for the same reason, as they seek relief against Michigan Supreme Court Justices due to satisfaction with the substance of their decisions, such as their refusal to review Court of Appeals decisions that were apparently adverse to Stanton. *See Combs v. Lambert*, 2007 WL 1322327, *3 (E.D. Ky. May 4, 2007) ("'[P]aradigmatic judicial acts', or acts that involve resolving disputes between parties who have invoked the jurisdiction of a court, are the touchstone for application of judicial immunity.") (quoting *Barrett v. Harrington*, 130 F.3d 246, 255 (6th Cir. 1997)), *recon. denied*, 2007 WL 1460357 (E.D. Ky. May 16, 2007).

**After the count denominated as count 17, Stanton asserts "Count 31" and then Count 18**, claims against the Coldwater Township treasurer and assessor, the Michigan Attorney General,

and the State and Branch County treasurers. Stanton claims first that because these defendants did not respond to his notice informing them that they and others were violating his rights, they have conceded his position that the conduct or policies which dissatisfy him are violations, *see* Comp ¶¶ 104-111. Next he claims that these defendants committed fraudulent denial of honest services in violation of 18 U.S.C. § 1346 by failing to assure and provide him an accountable, limited, republican government, and violated RICO, *see* Comp ¶¶ 112-121. The court has addressed these likely-meritless arguments above with respect to claims against other defendants.

**In counts 19 through 21, Stanton claims that the Michigan attorney general and assistant attorney general violated his rights by failing to litigate on his behalf in the Branch County Circuit Court and the Michigan Court of Appeals**, instead allowing and/or participating in the assertion of "fraudulent" claims against his private property and attendant rights, thereby violating their oaths of office, his right to a republican form of government, and 18 U.S.C. §§ 1341, 1346 and 1962, *see* Comp ¶¶ 122-147. **Counts 37 and 38** make very similar claims against the Michigan AG and AG for a different year, *see* Comp ¶¶ 230-239. The court has already addressed some of the statutory claims with respect to claims against other defendants, and in addition the claims against the state AG and AAG are likely to be defeated by the longstanding doctrine of absolute prosecutorial immunity, because they essentially challenge those officials judgments about which legal and policy positions to advocate on behalf of the State and how and where to best advocate them. *See Brooks v. Rothe*, 577 F.3d 701, 712 (6th Cir. 2009) (*"Those functions that occur in the course of the prosecutor's role as an advocate for the state*, e.g., acts taken to prepare for the initiation of judicial proceedings or to prepare for trial, *are protected by absolute immunity*. By contrast a prosecutor who performs the investigative functions normally performed by a detective

or police officer such as searching for the clues and corroboration that might give him probable cause to recommend that as suspect be arrested is entitled at most to qualified immunity.") (quoting *Cooper v. Parrish*, 203 F.3d 937, 946-47 (6th Cir. 2000)) (emphasis added).

**In counts 22 through 24, Stanton claims that Branch County Circuit Judge O'Grady violated his oath of office and Stanton's rights by failing to apply Stanton's view of the law in a proceeding to foreclose or seize Stanton's real property for nonpayment of property taxes**, by erroneously treating the proceeding as uncontested despite Stanton's alleged filing of a Notice of Special Appearance in Opposition to Amended Petition for Foreclosure, by failing to consider the factual allegations and legal arguments relevant to the dispute, by failing to provide him with a copy of the Judgment so that he could appeal and/or "exercise remedy by ordinary and/or extraordinary writ", and of course by violating 18 U.S.C. §§ 1341 and 1346 (mail fraud and obtaining property or money through false pretenses or representations) and RICO, *see* Comp ¶¶ 148-169. These claims is likely to be defeated by the doctrine of absolute judicial immunity.

**Counts 25 through 27 are also likely to be defeated by absolute judicial immunity**, because it claims that an attorney advising the Michigan Court of Appeals (Stoddard) and another employee of that court (Deitrich) had some role in recommending or causing the denial of his appeal as untimely when in fact, in Stanton's view, it was timely and/or not subject to otherwise applicable time limitations, thereby aiding and abetting fraudulent claims of his property's taxability and violating 18 U.S.C. §§ 1341, 1351, and 1962, *see* Comp ¶¶ 170-190.

**Counts 28 through 30 are again likely to be defeated by absolute judicial immunity**, because it claims that three judges of the Michigan Court of Appeals erroneously interpreted and applied the Constitution and federal case law, and committed mail fraud and other statutory

violations by mailing said erroneous, "fraudulent" decisions to him, *see* Comp ¶¶ 191-211.

**The second count denominated as "Count 31" and Counts 32 through 36** explain that they assert basically the same claims as counts 5 and 6, respectively, but pertain to those same defendants' conduct in different years, *see* Comp ¶¶ 212-230, so these counts are likely to fail for the reasons stated in the discussion of those earlier counts.

**In short, on the record thus far, not one of Stanton's claims appears to have a likelihood of success on the their merits. To the extent that his PI application rests directly or indirectly on any of those claims, then – particularly the claims about the Michigan Court of Appeals judges or staff exhibiting a pattern of unlawfully thwarting his attempted appeals – he does not satisfy the first criterion for preliminary injunctive relief**.

*Rooker-Feldman* Makes Stanton Unlikely to Prevail on Merits of Request for Federal-Court Review of or Interference with Michigan Courts' Rulings at this Stage of State Proceedings. Moreover, there is a second, independent reason why Stanton's attempt to eschew the normal state-court appellate process in favor of a preemptive federal "collateral attack" is unlikely to be approved by this court. Under the *Rooker-Feldman* doctrine , "'lower federal courts do not have jurisdiction to review a case litigated and decided in state court; only the United States Supreme Court has jurisdiction to correct state court judgments.'" *Robinson v. Wheeling & Lake Erie Ry. Co.*, 2009 WL 1015344, *2 (W.D. Mich. Apr. 15, 2009) (Maloney, C.J.) (quoting *Gottfried v. Med. Planning Servs.*, 142 F.3d 326, 330 (6th Cir. 1998)); *see also In re Smith*, – F. App'x –, 2009 WL 3049202, *2 (6th Cir. Sept. 24, 2009) (C.J. Batchelder, Suhrheinrich, Sutton) (citing *Marks v. Tennessee*, 554 F.3d 619, 622 (6th Cir. 2009)), *cert. denied sub nom. Smith v. Worthy*, – U.S. –, – S.Ct. –, 2010 WL

680611 (U.S. Mar. 1, 2010).

"This is equally true in constitutional cases brought under § 1983, since federal courts must give 'full faith and credit' to the judicial proceedings of state courts." *Gottfried*, 142 F.3d at 360. "Thus, even if the challenge is that the state court's action was unconstitutional, this court may not entertain the challenge." *Aslani v. Sparrow Health Sys. et al.*, No. 1:08-cv-298, 2009 WL 3711602, *17 (W.D. Mich. Nov. 3, 2009) (Maloney, C.J.) (citing, *inter alia*, *D.C. Ct. of Apps. v. Feldman*, 460 U.S. 462, 485-86 (1983)). *Accord Wilner v. Frey*, 421 F. Supp.2d 913 (E.D. Va. 2006) (*Rooker-Feldman* barred federal-court declaratory-judgment action brought by landowners who lost part of their property through adverse possession, even though they claimed that Virginia's adverse-possession statute was unconstitutional as applied to them), *aff'd*, 243 F. App'x 744 (4th Cir. 2007), *cert. denied*, – U.S. –, 128 S.Ct. 125 (2008). This is also true if the plaintiff claims that a state-court decision endorsed or permitted state action which violated a *State* Constitution. *See Angle v. Nevada Legislature*, 274 F. Supp.2d 1152 (D. Nev. 2003) (*Rooker-Feldman* barred district court from considering claim that enactment by simple majority vote of a measure to increase taxes violated the State Constitution's provision requiring a 2/3 vote for such an increase), *aff'd sub nom. Amodei v. Nevada State Senate*, 99 F. App'x 90 (9th Cir. 2004).

Nor is this court likely to hold that Stanton circumvent the *Rooker-Feldman* jurisdictional bar by arguing that the Branch County Circuit Court decision was not merely wrong but void *ab initio*. *See Searcy v. Clawson*, 70 F. App'x 907, 907-908 (8th Cir. 2003) (per curiam) (Bowman, Malloy, Smith) ("under the *Rooker-Feldman* rule, 'no federal district court has jurisdiction to decide that the state court judgment was void'") (quoting *Snider v. City of Excelsior Springs, Mo.*, 154 F.3d 809, 812 (8th Cir. 1998)); *see, e.g., Estate of Keys v. Union Planters Bank, N.A.*, 578 F. Supp.2d 629,

636-37 (S.D.N.Y. 2008) (notwithstanding plaintiff's contention that the state Supreme Court proceeded, "in clear absence of all jurisdiction," to defraud and unlawfully deprive her of property because "all persons concerned in [sic] executing such [void] judgments or sentences, are considered, in law, as trespassers," and that "a void judgment/order is a nullity [which] can be challenged and expunged in any State or Federal Court in the U.S.", court held that *Rooker-Feldman* barred federal district-court jurisdiction).

Consequently, even on fuller briefing and consideration, this court appears likely to hold that the only legitimate way for Stanton to secure federal-court review of the Michigan courts' judgment in his property-tax challenge (and their alleged refusal to consider constitutional arguments therein) is to seek review up to and including the Michigan Supreme Court before coming to federal court. "This is so because 28 U.S.C. § 1257, 'as long interpreted, vests authority to review a state court's judgment solely in the [U.S. Supreme] Court.'" *Schulze v. Claybanks Twp.*, 2009 WL 3586139, *12 (W.D. Mich. Oct. 23, 2009) (quoting *ExxonMobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005)).[4]

**Thus, whether or not the Tax Injunction Act (28 U.S.C. § 1641)[5] bars this court from**

---

[4]

The *Rooker-Feldman* doctrine does not bar a lower federal court's review of State "executive action, including determinations made by a state administrative agency." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 644 n.3 (2002); *see, e.g., Marks*, 554 F.3d 619 (holding that *Rooker-Feldman* did not bar federal district court's adjudication of disabled attorney's ADA action against State of Tennessee and its Administrative Office of the Courts, alleging that state trial judge and AOC discriminated and retaliated against him in underlying legal-malpractice action because of his disability). This is of no avail to Stanton, however, as he is now challenging the judgment of the Branch County, Michigan Circuit Court, and seeking to preliminarily enjoin its enforcement, not some action or determination by a state administrative agency or tribunal.

[5]

*See generally Commerce Energy, Inc. v. Levin*, 554 F.3d 1094, 1096-97 (6th Cir.) (Martin, McKeague, E.D. Tenn Chief D.J. Collier) (discussing the Act and its interpretation), *cert. denied*,

reviewing the Branch County Circuit Court's judgment, this court is likely to hold that the *Rooker-Feldman* doctrine does bar such review. *Cf. Zerod v. Caprathe*, 76 F. App'x 65 (6th Cir. 2003) (per curiam) (Siler, Batchelder, Cook) (*Rooker-Feldman* doctrine deprived district court of jurisdiction to hear former owners' civil-rights complaint attacking state judicial process which determined that they no longer owned real property which the state had seized for nonpayment of taxes); *Ritter v. Ross*, 992 F.2d 750 (7th Cir. 1993) (Coffey, Easterbrook, Wood) (*Rooker-Feldman* barred landowners from bringing federal-court action to challenge state-court foreclose judgment as violative of their due process rights, as they had not not yet availed themselves of some state-law, state-court avenues to overturn the foreclosure judgment or recover the proceeds from the government's sale of their land).

Accordingly, the court must decline to issue a temporary restraining order or a preliminary injunction of actions to enforce and implement the Branch County Circuit Court judgment of foreclosure or any other state-court judgment entered before the initiation of the instant action in connection with his property-taxation challenges. *See Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("While, as a general matter, none of these four factors [is] given controlling weight, *a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed*.") (citing *Sandison v. Mich. H.S. Athletic Ass'n*, 64 F.3d 1026, 1037 (6th Cir. 1995)) (emphasis added).[6]

---

– U.S. –, 130 S.Ct. 496 (2009).

[6]

Nor does Stanton satisfy the other three criteria for preliminary injunctive either, as noted above. As to the critical fourth factor, there is no legally cognizable "irreparable harm" from being required to abide by a state-court judgment which one refuses, without apparent good cause, to appeal through the readily available normal channels of a state court system.

## <u>ORDER</u>

The plaintiff's application for preliminary injunctive relief [document #5] is **DENIED**.

This is not a final order, but it <u>is</u> immediately appealable to the U.S. Court of Appeals for the Sixth Circuit. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 572 (6th Cir. 2002) ("A district court's denial of a motion for a temporary restraining order is not appealable. Such a ruling is appealable, however, if it is tantamount to a ruling on a preliminary injunction.") (citations omitted).

**IT IS SO ORDERED** on this  8th  day of March 2010.

/s/ Paul L. Maloney
Honorable  Paul L. Maloney
Chief United States District Judge